[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
The plaintiff wife, 47, whose birth name is Lake, and the defendant husband, 54, married on October 9, 1976 in Palm Beach, Florida. This court has jurisdiction founded on the defendant's continuous residence in Connecticut since 1984 until the present time. No child was born to the plaintiff during the marriage. CT Page 448-Z Both parties are in good health.
 II.
The plaintiff received an A.B. degree from Wheaton College in 1970. After working for two years as a photographer's model in New York City in 1972, she became a stock-broker at E.F. Hutton and Company in New York City, receiving six months training. The plaintiff also enrolled at Fordham Law School evening session at this time. In 1974 she joined United States Trust Company of New York in its financial planning department where she remained until after graduation from law school in June, 1976. While employed, the plaintiff passed the New York bar exam that summer. In October, 1976 she was hired as an associate by Davis, Polk 
Wardswell for their Trusts and Estates Department. After three years the plaintiff transferred to the firm's Corporate Department representing underwriters in securities transactions and banks in loan transactions. In December, 1982, after a visit by two partners, the plaintiff left the law firm.
Shortly thereafter the plaintiff was hired by Union Carbide for their law department located in Danbury, Connecticut at about the same annual salary level she had reached at the law firm. She applied her experience to review of revolving credit agreements, loan agreements, SEC filings and related financial matters. She CT Page 448-AA believed that she had, after a year, become the subject of "de facto discrimination" and she determined to find other employment which she did in 1986. Phibro Energy, Inc., of Greenwich, Connecticut, a subsidiary of Salomon, Inc., a financial concern based in New York City, hired her as an attorney. Phibro engaged in commodities trading, primarily in oil, unleaded gasoline and heating oil. Her initial annual salary was $90,000. In 1989, her third year of employment, a combination of a lower salary and a bonus her total compensation in 1989 was $125,000.
The plaintiff assisted in the establishment and development of "oil swaps", off-exchange futures contracts individually negotiated between corporate entities, a financial invention of Phibro. The kinds of contracts needed for this new business were written by the plaintiff. Many other companies asked the plaintiff for sample contracts.
In 1986 the plaintiff set up PECC, a futures commission merchant. She obtained all of the registrations and approvals from the government offices and the New York Mercantile Exchange (NYMEX), served as compliance officer and counsel, and established Phibro's NYMEX floor and clearing operations. The plaintiff was responsible for Phibro's compliance with the UK laws for their London operations. She handled Phibro's registration and compliance on the Sydney Futures Exchange. In CT Page 448-BB short, plaintiff had responsibility for Phibro's activities worldwide for trading compliance in oil, coal and other commodities.
In 1989 the plaintiff was appointed to a commission formed by the Association of Futures Brokers and Dealers, Limited (AFBD) to assist it in its oversight and regulation of the oil market investment industry in the UK. She was the only USA citizen chosen. The was named to a subcommittee to develop a "white paper" regarding regulation of the Brent Market, a paper market for oil trading in Brent crude oil prices. The plaintiff has stated that certain of her contract forms had become standards in the industry by 1990 (Defendant's Exhibit B).
In 1989 the company president requested the plaintiff to form their Derivative Products Contracts Department which she then managed as an additional assignment. All of Philbro's derivative product contracts business was supervised by the plaintiff.
In the spring of 1990 the plaintiff requested a substantial raise resulting in her being terminated. She did perform some consulting work for Phibro for two months thereafter for which work she was paid $50,000.
After leaving Phibro the plaintiff did not seek any CT Page 448-CC employment. Instead, she visited the defendant's office daily to trade commodities, primarily oil futures, from which she accumulated profits of $100,000. Venturing into T-bonds she had reversals, losing about two-thirds of her profits.
After several months, when the defendant concluded the plaintiff had no plans to resume her career, he asked if she would undertake to be the general contractor on the home renovations. She agreed.
Shortly thereafter the plaintiff did undertake the job of general contractor for the renovation of the home they had purchased in 1984 in New Canaan known as 115 Hemlock Hill Road for $475,000. She devoted her time to the supervision of the workers at the residence for the balance of 1990, 1991 into early 1992, (c.f. Defendant's Exhibits H and I). The defendant either paid the tradesmen directly or reimbursed the plaintiff if she had paid.
 III.
The defendant received an A.B. degree from Ripon College and a MBA from the University of Maine. After one year at Irving Trust as an analyst the defendant has been a stockbroker since 1972 with the same firm although his employer's name changed due CT Page 448-DD to mergers. He is now a Senior Vice President at Smith Barney, paid commissions monthly. He also receives stock in Travelers, the parent corporation, and longevity pay. His financial affidavit filed at time of trial listed his gross monthly earnings as $40,329.22. The defendant's 1995 1040 tax return (Plaintiff's Exhibit #16) lists gross earnings of $427,201. Since the defendant participates in their "cap accumulation plan" the employer's distribution of stock is treated as and taxed as income to the defendant. This resulted in his commissions through June, 1996 totaling $292,283, but his gross earnings totaled $485,000.
 IV.
The plaintiff began taking horseback riding lessons in 1979. Both parties engaged in riding horses as recreation for a period of time. The defendant purchased a horse for plaintiff for $17,000 and then defendant purchased a second horse for plaintiff named Checkmate for $35,000. The plaintiff rode daily and began to attend weekend shows known as the "A Circuit". As plaintiff's enthusiasm for horses waxed, the defendant's waned to a point the plaintiff said, "For himself he was disgusted with the horse business" (Transcript, P. 100, 8/9/96).
The defendant's hobbies included sports cars, motorcycles and CT Page 448-EE boats. The defendant characterized the plaintiff's interests as "white collar" and his as "blue collar."
It is also noted that the parties never travelled or vacationed together after 1990.
 V.
The plaintiff visited the defendant's office in October or November, 1992 and demanded that he fire his female sales assistant or plaintiff would seek a divorce. The defendant declined to fire his assistant and requested a divorce. At the plaintiff's suggestion, neither party would hire an attorney, the plaintiff would prepare their separation agreement and would then commence a pro se dissolution action. Together they visited their C.P.A. firm, Feldman Feldman, in Long Island to review their separation of assets, particularly the tax consequences. A division of the assets was agreed upon and was carried out in the following fashion. By letter dated 11/30/92 (Defendant's Exhibit J) the plaintiff directed the defendant to transfer half of her securities and half of her debit balance to the defendant's account and simultaneously the letter requested the defendant to transfer half of his accounts to the plaintiff. The transfers were completed, and shortly thereafter the plaintiff quit claimed her half interest in the marital home to CT Page 448-FF the defendant by deed dated January 15, 1993 (Defendant's Exhibit L) for which she received about $273,000. The defendant refinanced the parties' mortgage thereby removing the plaintiff's liability (Plaintiff's Exhibit #12). To memorialize their agreement the plaintiff undertook the task of drafting the written agreement. She received forms and assistance from her mother, a Massachusetts attorney, who had an emphasis in matrimonial law in her practice. The final draft was executed by the parties on June 1, 1993 (Plaintiff's Exhibit #6) and the plaintiff vacated the marital home on the same day.
It is noted by the court that the plaintiff, an attorney, is admitted in Connecticut as well as in New York. It was acknowledged by the plaintiff that she had acted as her husband's lawyer on several occasions in the years prior to 1993. An examination of the signed agreement (Plaintiff's Exhibit #6) reveals the following statements.
 "AGREEMENT made as of this 1st day of June 1993 by and between BEVERLY L. WILKES of New Canaan, Connecticut (the "Wife") and LAWRENCE R. WILKES of New Canaan, Connecticut (the "Husband").
 WITNESSETH
WHEREAS, the parties were married in Palm Beach, Florida CT Page 448-GG on October 9, 1976 and, although presently residing in the same house at 115 Hemlock Hill Road, New Canaan, Connecticut (the "New Canaan Property"), acknowledge that they have been living separate and apart since at least November 1, 1992; and
 WHEREAS, there have been no children born of the marriage; and
 WHEREAS, the parties are desirous of obtaining a divorce in an amicable manner, without litigation or acrimony, and of making provisions with respect to the division of their separate and joint property.
 NOW THEREFORE, in consideration of the mutual promises, agreements and covenants contained herein, the parties hereby promise, agree and covenant as follows:"
The court finds as fact that the parties lived separate and apart since at least November 1, 1992.
The agreement, in paragraphs A. 1. through A. 9., details the division of all their property. The plaintiff's use of a leased wagon automobile, the defendant's assumption of a loan liability of the plaintiff secured by a boat, and, in A. 9. allowing each party to retain sole ownership of his or her respective IRA, CT Page 448-HH company retirement or other similar accounts.
In B. the defendant agreed to carry the plaintiff on his employer's medical and dental plans until either party's remarriage, the plaintiff's employment provided similar benefits or the termination of the defendant's employment. The defendant has continued the plaintiff's coverages. The court finds this ongoing obligation furnished present consideration for their agreement. The agreement was not based entirely on past consideration as the plaintiff claims. Osborne v. Locke SteeleChain co., 153 Conn. 527, 532 et seq. (1966).
By June 1, 1993 the agreement had been executed and on that day the plaintiff moved to Bedford, New York.
Despite several requests from the defendant the plaintiff did not initiate a dissolution of marriage action until July 6, 1994 when, acting pro se, she obtained a summons issued by an assistant clerk at Stamford Superior Court. The defendant was served on July 12, 1994 in hand. He filed a pro se appearance dated 10/17/94 in the action FA94 0139941. The complaint prayed for
"a. A decree of dissolution of the marriage;
b. An equitable division of the property and estates of CT Page 448-II the parties;
 c. Such other and further relief as this court deems equitable."
The court finds as fact that the plaintiff represented to the defendant that she would process the dissolution action to conclusion, thereby inducing the defendant to complete the transfers of assets. The court further finds as fact that the defendant relied on the plaintiff to prepare the agreement and to prosecute the action. The agreement is accurate when it states:
 "C. The parties are amicably seeking a divorce and acknowledge their deep friendship and respect for each other."
Shortly after moving to Bedford, New York the plaintiff began dating other men, engaging in sexual relations with two men by her own admission. The court finds as fact such conduct to be consistent with an irretrievably broken down marriage.
The plaintiff now claims that the parties' agreement was induced by fraud. The court finds no fraud. The plaintiff next claims she was not qualified by background or experience to draft a separation agreement, and was under extreme emotional distress CT Page 448-JJ when the assets were divided. The court finds her testimony on this regard and her claim not credible. Her recognized expertise in drafting complicated derivative agreements belies this claim.
The defendant remortgaged the marital home on January 13, 1993, raising $349,114.97 in fresh funds with the new mortgage obligation being $500,000 (Plaintiff's Exhibit #12). This was the source of the payment to the plaintiff for her interest in the home. The appraisal of the property, made for the mortgagee on December 11, 1992, found an estimated market value of $820,000 (Defendant's Exhibit MM).
It stated:
 "The subject is in superior condition, its renovation was extensive and completed with professional materials and workmanship. "
The court finds that $800,000 was the fair market value of the marital home. The defendant paid the plaintiff $274,000 on or about May 23, 1993, net of agreed upon expenses, including $28,000 lump sum paid covering the installments remaining due on the plaintiff's vehicle. The plaintiff's current fair market value is $995,000 (Plaintiff's Exhibit #36).
The parties agreed to retain their respective IRA, company CT Page 448-KK retirement or similar retirement savings accounts (Plaintiff's Exhibit #6, A. 9). The defendant gave the plaintiff all of the pertinent information regarding his deferred income or retirement benefits, either when plaintiff came to his office, or by photocopy. The court does not find any failure to disclose or any misrepresentation.
The plaintiff brought no assets to the marriage. The defendant then owned an auto, a motorcycle and municipal bonds valued between $50,000 and $100,000. The defendant received several annual gifts from his parents of $6,000 each. In 1985 his father died. The defendant inherited about $500,000. These proceeds were included in the 50/50 split of assets.
 VI.
The agreement is not found to be void. The plaintiff voluntarily undertook the preparation of the separation agreement. She obtained sample agreements from her mother, an attorney practicing in this area of the law.
The reason the agreement is submitted to the court is not to have its validity declared but to have a determination made by the court, after its searching inquiry, to have it declared fair and equitable, Monroe v. Monroe, 177 Conn. 173. Private CT Page 448-LL settlement of the financial affairs between estranged spouses should not be undermined, Hayes v. Beresford, 184 Conn. 558, 568.
On the other side, this court finds no basis for the defendant's claim that an equitable estoppel has occurred. An equal division of assets between spouses after a viable marriage of 16 years' duration, and nominally of 20 years is not an inducement nor has the defendant proven any change of position to his detriment.
For the plaintiff to argue that, because financial affidavits were not prepared in support of their agreement to divide their assets is to allow form to exult over substance. The plaintiff examined the defendant's records at his office; he gave her copies of all documents and records she requested; and he had a reasonable basis to assume she was acting on his behalf. It is the plaintiff, a lawyer, who is charged with being
 ". . . an officer of the legal system and a public citizen having special responsibility for the quality of justice.",
quoting the preamble to the "Rules of Professional Conduct".
The court is satisfied that the parties did know the nature and value of their respective IRAs and other tax CT Page 448-MM deferred compensation and that the values were roughly equal at the time the parties' assets were divided.
It would be most inequitable to allow the plaintiff to retain the benefits of the agreement which she prepared and which she now seeks to void.
Cuneo v. Cuneo, 12 Conn. App. 702 (1987) states the broad principle at p. 709 that:
 ". . . the financial awards in a marital dissolution case should be based on the parties' current financial circumstances to the extent reasonably possible.
Practice Book § 463.
This principle was again stated in Zern v. Zern,15 Conn. App. 292 296 (1988) and Roach v. Roach, 20 Conn. App. 500, 508
(1990).
The plaintiff's total net assets as listed on her financial affidavit of 1996 exceed $2,400,000. The defendant's assets total to $5,086,473 as listed in his current financial affidavit.
The plaintiff elected to seek no gainful employment since the separation, electing to finance her life style from her assets and income thereon. It is interesting to note that the plaintiff CT Page 448-NN had no complaint regarding the defendant's management of her securities portfolio until she transferred her accounts.
The plaintiff was responsible for the delay that occurred after the separation. None of the delay was attributable to the defendant. Cuneo, supra, p. 709. The court has concluded that, since each party made no contribution to the other's assets after the separation it is equitable to allow the division of assets to stand, Pappageorge v. Pappageorge, 12 Conn. App. 596, 600 (1987).
The defendant's father created a testamentary trust (Plaintiff 's Exhibit 30) which now provides income for his widow, during her lifetime and then for distribution of the remaining corpus to the defendant and two siblings in equal parts. However, the court finds the expectancy too speculative for attribution to the defendant now. Also, the plaintiff contributed nothing to the trust nor did the defendant.
 VII.
The plaintiff cancelled the final hearing scheduled for the pro se action, giving as reason her discovery that the defendant had formed a romantic and sexual relationship with his sales assistant, the same person who was in Philadelphia with the defendant in October, 1991. The defendant had gone to CT Page 448-OO Philadelphia to meet a friend. The defendant's sales assistant was staying at the Ritz-Carlton Hotel for the weekend, planning to visit with her sister. The defendant stayed at the sister's apartment when his friend failed to keep the appointment for Friday night. The hotel bill was introduced as evidence (Plaintiff's Exhibit #5). It contained charges for calls to the parties' New Canaan home. The billing listed the sales assistant as the hotel guest.
The plaintiff discovered the hotel bill in January, 1992 when it slid out from under the front seat of her car. The plaintiff asked for an explanation which, at trial, she testified she found to be "unbelievable". The plaintiff took no responsive action after her discovery of the bill, however. The court infers that this episode is but one example of a failing marriage.
The ongoing renovations strained the parties relationship. There was little furniture in the home. The sleeping arrangements were primitive. For several months prior to November, 1992 the parties did not share the same bed.
The court concludes that the Philadelphia weekend trip, the house renovations, and the lack of common interests all contributed to the marriage breakdown.
Both parties committed adultery after November, 1992. The CT Page 448-PP marriage was already irretrievably broken down. Venuti v. Venuti,185 Conn. 156.
The parties' conduct subsequent to that month is consistent with the court's conclusion. Their agreement, sworn to by both parties, states they "have been living separate and apart since at least November 1, 1992". The plaintiff's conduct after moving to Bedford, New York, is consistent with an irretrievably broken down marriage. Between November, 1992 and June 30, 1993 the plaintiff was absent frequently on trips.
 VIII.
From the summer of 1993 until the fall or 1994, the plaintiff rented a summer place in the Hamptons, took a trip to Ireland, spent the winter at the Palm Beach Polo Club while maintaining a home in Bedford, New York, at a monthly rental of $2,000.
 IX.
In October, 1994 the plaintiff incorporated Field Point Farm located on 10 leased acres in Wellington, Florida. Horses are boarded and, in the future, the plaintiff intends to buy and sell horses. The lease is month-to-month. Both show horses purchased by the plaintiff are currently valueless, one being lame and the CT Page 448-QQ other having neurologic damage. For the first six months of 1996 the expenses of running the farm exceeded income by $9,000. The farm is licensed for animal care as a stable (Plaintiff's Exhibit #3).
 X.
In March, 1993 the plaintiff met Jennifer Naegele while both were on a ski vacation in Vail, Colorado, leading to a close friendship. The following winter while in Palm Beach the plaintiff and Miss Naegele visited frequently. In the summer of 1994 the plaintiff visited her friend in Nantucket. In the fall of 1994 they spent a week at an exclusive spa in California.
Miss Naegele had a problem. Her former fiance had embezzled about $5,000,000 of her money. She employed a number of law firms in Florida in efforts to recoup. The plaintiff oversaw the case for her which was concluded successfully. Miss Naegele paid nothing to the plaintiff for her legal skills but made a $10,000 gift. Miss Naegele acknowledged that the plaintiff's legal expertise helped her through the "very horrific" experience.
The plaintiff and Miss Naegele, when not in each other's company, spoke on the telephone three or four times daily from the end of 1994 to early 1996. Legal advice was rendered by the CT Page 448-RR plaintiff to Miss Naegele on a daily basis, usually an hour or more daily.
The plaintiff also recommended the defendant to Miss Naegele as a skilled money manager. In 1995 she transferred securities totaling between $12,000,000 and $15,000,000 to the defendant for management. In early 1996 the account was removed from the defendant's management.
 XI.
The plaintiff has not engaged in the practice of her profession since leaving Philbro. After the physical separation occurred the plaintiff traveled until she began the horse boarding business.
Each party introduced expert testimony regarding the plaintiff's opportunity for employment in Florida where the plaintiff established residence.
The plaintiff's expert, Mr. Lee Thomson of West Palm Beach, Florida based his testimony on his major premise that the plaintiff's search for legal work would be confined to the state of Florida. He acknowledged that the plaintiff's skills are marketable in the Northeast part of the country. The geographic CT Page 448-SS relocation by the plaintiff is analogous to voluntarily quitting her position and therefore voluntarily imposed. The court cannot accept the limiting conditions.
The defendant's expert, Mr. Ronald George Cullis, is a management consultant for law firms around the country. He also owns and operates a two hundred acre thoroughbred breeding and training farm in Maryland. Previously he had been the Executive Director of Millbank, Tweed, Hadley and McCloy, a large New York City law firm, with several other offices around the world. He adopted the same limitation of opportunities within the state of Florida, but he opined that the plaintiff, given her skills and background, could find employment within six months, although it is not a big market for people capable of working in the area of complex financial transactions. The court is not convinced that the plaintiff could obtain a position approaching $100,000 as opined by Mr. Cullis, in the immediate future.
Mr. Thomson opined that it would take a year of structured job searching five days weekly, as well as passing the Florida Bar to obtain a position having a fraction of her last salary. The court does not accept this estimate for he evaluated her with an inexperienced lawyer.
Since Mr. Thomson opined that he was familiar with horse CT Page 448-TT operations similar to Field Point Farm, he believed the plaintiff could generate $20,000 to $25,000 income from her operation.
The difference between the anticipated income from the horse farm and the plaintiff's potential as an attorney practicing in Florida is de minimis.
 "It is well established . . . that under appropriate circumstances, the trial court may, in a marital dissolution proceeding, base financial awards on the earning capacity rather than the actual earned income of the parties." Miller v. Miller, 181 Conn. 610, 611-12 (1980)
Ordinarily, the earning capacity principle is applied to a payor's avoiding employment in the payor's chosen field, Hart v.Hart, 19 Conn. App. 91, 95 (1989). The same rule can be applied to a potential payee who is seeking alimony from the spouse. Also, by analogy, the circumstances surrounding the payee's request must be conditions occurring that are beyond the control of the party seeking alimony. c.f. Sanchione v. Sanchione,173 Conn. 397, 407 (1977); Richard v. Richard, 23 Conn. App. 58, 63
(1990); Mark v. Mark, 40 Conn. App. 171, 174 (1996).
The plaintiff's removal to Florida was voluntary. Her failure to seek employment in either the financial sphere or the legal CT Page 448-UU profession was voluntary. Her claim that her legal skills have been dulled by the passage of time is not only voluntary but is belied by her supervision of the Naegele recovery described above.
However, both parties predicated their evidence on the Florida legal profession's job availability. Therefore, the court does not have sufficient evidence of available opportunity in the financial and legal areas as they now exist in the Northeast. The plaintiff's former earning capacity as it existed six years ago was well established.
 XII.
Another element of the analysis to determine the need for an alimony award is the potential income afforded by the property the parties divided between them. The plaintiff's securities portfolio, when managed by the defendant, and more recently by another broker, has been invested for capital gains, many gains remaining unrealized. It is interesting to note that on the plaintiff's mortgage application of August, 1995, she listed her capital gains to state a monthly income of $45,700 (Defendant's Exhibit II). By the same token the defendant has managed his stock portfolio in the same manner. If the court was to assess the plaintiff's income based on 5.8% tax exempt bonds or e.g. CT Page 448-VV U.S. treasury notes with 01/99 maturity currently yielding 6.026% as of 1/23/97[1], then the court must assess the defendant in like fashion.
The defendant has consistently maintained a life style that cost him over $500,000 yearly. He finances it through his earnings and by withdrawals from his brokerage account. His earning capacity (Plaintiff's Exhibit #20) is $515,000, but his 1995 tax return reports $446,438 (Plaintiff's Exhibit #16). The court notes that the parties filed a joint 1040 for 1994 for which a $42,000 refund was received and is being held by the defendant. Without recapitulating all of the financial evidence the record is abundantly clear that the defendant's earned income and his capacity to generate earned income far exceeds the plaintiff's capacity by a multiple of at least four.
 XIII.
The statute governing alimony is separate from the statute governing a property division. There is nothing explicit regarding alimony in the parties' agreement. Abandonment of all alimony rights is not to be inferred from a separation of assets and terms of general release cannot be said to encompass this separate, valuable right. Since the agreement is silent on alimony the court concludes that the issue of alimony is not CT Page 448-WW disposed of by the agreement. The court finds it significant and consistent with this conclusion that on March 31, 1995 that the defendant sent a letter to the plaintiff asking her to waive alimony. (Plaintiff's Exhibit #7) The court is satisfied the plaintiff is entitled to an award of alimony.
Finally, the plaintiff's failure to seek alimony for several years after the separation does not preclude her request in this case, Roach, supra, p. 507.
The plaintiff is entitled to a time limited award to provide an incentive to the plaintiff to use diligence in honing her skills and in returning to work, Makarian v. Makarian,2 Conn. App. 14, 16 (1984); Ippolito v. Ippolito, 28 Conn. 745. The plaintiff has had multiple careers, attending to her intelligence and sagacity. A period of six years duration is found to be appropriate.
 XIV.
The court has been asked to evaluate the plaintiff's request for attorney's fees, Sec. 46b-62, Conn. Gen. Stat. The purpose of the award is to prevent what has been obtained from being diminished by the costs incurred, thereby undermining the other financial orders, Fitzgerald v. Fitzgerald, 190 Conn. 26, 34
CT Page 448-XX (1983). In order to maintain the parity the court believes was created by the parties via their division the court will award attorney's fees to the plaintiff.
 XV.
Neither party is an "innocent" party. The plaintiff was not just a "scribe" in preparing the separation agreement. Her claim of ignorance of the law is incredible in light of her credentials. Her claim of ignorance of the defendant's finances is also not credible. For the defendant, his desire to save an attorney's fee in finalizing the dissolution is nothing short of astonishing. The court is not prepared to award kudos to either side.
The court is of the opinion that further detailed analysis of the record is not needed. Having reviewed the record, which is voluminous, the transcripts, which are lengthy, and the respective post-trial briefs of the attorneys, which are excellent, the court enters the following decree.
1. A judgment of dissolution is entered on the ground of irretrievable breakdown. Each party is declared unmarried.
2. The court enters the following order as to property CT Page 448-YY division, finding that the parties' division was fair and equitable when made effecting a 50/50 division. Each party shall continue to own and possess the assets and liabilities as presently owned and possessed. The boat shall become the defendant's sole property if currently in both names.
3. The defendant shall pay to the plaintiff, as periodic alimony, the sum of $8,500 monthly, the first such payments due for the month of February, payable on the 15th of each month. A contingent wage withholding order is entered. The payments shall terminate on the remarriage of the plaintiff, the death of either party, or further court order whether based on Sec. 46b-81, Sec.46b-82, or upon the expiration of six years in all events despite any change of circumstances, Rau v. Rau, 37 Conn. App. 209.
4. An allowance to prosecute of $150,000 is awarded to the plaintiff, payable on or before April 1, 1997 in full.
5. The 1994 tax refund shall be divided equally between the parties.
Counsel for the plaintiff is directed to prepare the judgment file.
HARRIGAN, J. CT Page 448-ZZ